UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Amin Hasanzadeh,<br><br>Defendant.<br>_____/ | Case:2:20-cr-20594<br>Judge: Hood, Denise Page<br>MJ: Patti, Anthony P.<br>Filed: 12-16-2020 At 12:51 PM<br>INDI USA V. HASANZADEH (DA)<br><br>Violations:<br><br>50 U.S.C. § 1705<br>(International Emergency Economic Powers Act)<br><br>31 C.F.R. Part 560<br>(Iranian Transactions and Sanctions Regulations) |

## **INDICTMENT**

THE GRAND JURY CHARGES:

### **GENERAL ALLEGATIONS**

1. Amin Hasanzadeh ("HASANZADEH") is an Iranian national who, at all times relevant to this Indictment, lived and worked in the Eastern District of Michigan and became a Legal Permanent Resident of the United States on or about August 24, 2013.

2. Coconspirator A, the brother of HASANZADEH, is a citizen of Iran and resided in Iran continuously during all times relevant to this Indictment.

3. Coconspirator B is a citizen of Iran who resided in Iran continuously during all times relevant to this Indictment.

1

4. The relationship between HASANZADEH, Coconspirator A, and Coconspirator B dates back at least a decade to when HASANZADEH still lived in Iran. In 2008, HASANZADEH wrote a business plan in Persian (commonly referred to as Farsi) for an Iranian company named Kavoshe Samaneh Ayria Asia Company, with a business address in Tehran, Iran. The proposed business product was uninterruptable power supplies. In the business plan, HASANZADEH was identified as the company's founder, Coconspirator A was identified as a coworker, and Coconspirator B was identified as a consultant. Under the "Important business risk" section of the business plan, "Sanctions on Imported parts" was listed.[1]

## THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT AND THE IRANIAN TRANSACTIONS AND SANCTIONS REGULATIONS

5. The International Emergency Economic Powers Act ("IEEPA") authorizes the President of the United States to deal with "unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats. 50 U.S.C. § 1701(a). Since 1979, and through the present day, U.S. presidents have repeatedly declared that the actions and policies of the Government of Iran ("GOI") pose a threat to the United States' national security including, among

---

[1] Note that this translation is not a verbatim translation of the original Farsi.

other actions, the GOI's pursuit of nuclear weapons and its sponsorship of terrorism.

6. Since 1979, the United States has adopted a series of statutes, executive orders, and regulations designed to check the national security threat posed by the GOI's policies and actions, including the Iranian Transactions and Sanctions Regulations ("ITSR"). 31 C.F.R. Part 560. The ITSR target, among other things, exports of technology from the United States or by U.S. persons to Iran.

7. The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy, or economy of the United States. OFAC issued the ITSR.

8. Without a license from OFAC, the ITSR prohibit the following:

    a. "The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran." 31 C.F.R. § 560.204.

    b. "Any transaction on or after the effective date [meaning 1979] that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part" and "[a]ny conspiracy formed to violate any of the prohibitions set forth in this part." *Id.* § 560.203.

    c. "The release of technology or software in the United States, or by a United States person wherever located, to any person . . . if made with knowledge or reason to know the technology is intended for Iran or the Government of Iran . . . ." *Id.* § 560.418.

9. Pursuant to IEEPA, "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

10. The Grand Jury incorporates by reference and realleges these General Allegations into each and every count of this Indictment as though fully alleged therein.

## COUNT ONE

**50 U.S.C. § 1705 and 31 C.F.R. Parts 560.203, 560.204, and 560.418 -
Conspiracy to unlawfully export technology to Iran and
to defraud the United States**

11. From in or about November 2014, up to and including June 2016, in the Eastern District of Michigan and elsewhere, HASANZADEH, Coconspirator

4

A, and Coconspirator B did willfully and unlawfully combine, conspire, and agree together, with each other, and with other persons, both known and unknown to the Grand Jury, to commit offenses against the United States, to wit to export and supply and caused to be exported and supplied from the United States to Iran, technology, including schematics, layouts, designs, projects, diagrams, performance reports, and other documents and data, without having first obtained the required licenses from OFAC, in violation of Title 50, United States Code, Section 1705 (IEEPA), and Title 31, Code of Federal Regulations, Parts 560.203, 560.204, and 560.418 (ITSR).

## OBJECT OF THE CONSPIRACY

12. The object of the conspiracy was to transfer technology to Iran, including to Coconspirator A and Coconspirator B who resided and worked in Iran, without first obtaining the required licenses from OFAC, as required by law, in violation of 50 U.S.C. § 1705 and 31 C.F.R. Parts 560.203, 560.204, and 560.418.

## MANNER AND MEANS OF THE CONSPIRACY

13. The conspirators used the following manner and means to accomplish their objectives.

14. In the fall of 2014, HASANZADEH applied for a job as a senior hardware engineer at Company A. Company A is a technology company located in

the Eastern District of Michigan that has domestic and international clients in, among other sectors, the automotive and aerospace industries.

15. In November and December 2014, before he began working for Company A, HASANZADEH emailed technical job specifications and descriptions of Company A's technology architecture and platforms to Coconspirator A in Iran.

16. On or about January 12, 2015, HASANZADEH began employment with Company A as a senior hardware engineer.

17. As a senior hardware engineer, HASANZADEH was given access to Company A's highly sensitive confidential and proprietary technology in the form of schematics, layouts, designs, projects, diagrams, performance reports, and other documents and data. During his employment with Company A, HASANZADEH was granted access to some of Company A's most sensitive and valuable projects and proprietary technology.

18. Six days after beginning employment with Company A (on the first weekend of his employment), HASANZADEH surreptitiously began emailing Company A's confidential and proprietary documents and data, as well as confidential documents and information from Company A's customers and partners, to, among others, Coconspirator A in Iran.

19. HASANZADEH concealed these transfers from Company A by first transferring the documents, data, and information to his personal email account and then sending the materials from his personal email account to, among others, Coconspirator A and Coconspirator B in Iran.

20. For about the next year and a half, HASANZADEH, without Company A's knowledge or consent, sent to Iran hundreds of Company A's proprietary and highly valuable schematics, layouts, designs, projects, diagrams, performance reports, and other documents and data. HASANZADEH emailed the bulk of Company A's misappropriated materials to Coconspirator A and/or Coconspirator B.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

21. On or about November 15, 2014, HASANZADEH sent Coconspirator A an email with the subject line, "Fwd: [Company A] Hardware Engineer". The email contained a job description for Company A's Hardware Engineering Team.

22. On or about December 18, 2014, HASANZADEH received an email from the recruiting agency that facilitated HASANZADEH's employment at Company A. The email contained a suggested reading list, requested by HASANZADEH, related to HASANZADEH's prospective employment at Company A.

23. On or about December 20, 2014, HASANZADEH forwarded the suggested reading list to Coconspirator A with the subject line, "We need to talk."

24. On or about January 12, 2015, HASANZADEH began working for Company A in the Eastern District of Michigan.

25. On or about January 12, 2015 [2020 struck through], HASANZADEH signed his Employee Agreement with Company A, in which he agreed, among other things, "not to use or disclose, directly or indirectly" for his "own benefit or for the benefit of another" Company A's trade secrets and "not to disclose any information which is confidential to any" Company A customer/partner.

26. On or about January 18, 2015, HASANZADEH sent an email from a personal email account to the same personal email account with the subject line, "Data Sheet" and attached four technical documents that he received as a result of his employment with Company A. HASANZADEH then forwarded that email to Coconspirator A and, in a follow-up email later the same day, HASANZADEH sent Coconspirator A another document and directed him to specific pages within the documents. One of the documents that HASANZADEH emailed to Coconspirator A was marked "Confidential" and belonged to an identified U.S. company that was a partner of Company A. Another document that HASANZADEH sent to Iran was marked "NDA Confidential" and belonged to Company A.

27. From on or about March 2, 2015 through March 13, 2015, HASANZADEH sent a series of emails from his personal email account to Conspirator B, blind copying (bcc) Coconspirator A. Attached to those emails were highly sensitive and proprietary technical documents and data belonging to Company A.

28. At approximately 3:48 pm on or about March 14, 2015, HASANZADEH sent an email from his personal email account to Coconspirator B with the subject line, "HXXXXXXX."[2] Attached to the March 14, 2015 email were highly sensitive and proprietary technical documents and data that belonged to Company A. The stolen documents and data concerned one of Company A's most valuable technologies – a central processing unit ("CPU") hereafter referred to as "Omega." Company A created Omega after years of research and development and estimates that it is worth tens of millions of dollars.

29. At approximately 6:18 pm on or about April 1, 2015, HASANZADEH sent an email from his personal email account to Coconspirator B with the subject line, "First revision." As before, HASANZADEH attached to the email highly sensitive and proprietary technical documents and data belonging to Company A.

---

[2] Because the subject line of this email referred to the codename of Company A's proprietary technology, it has been partially obscured in the Indictment.

9

30. At approximately 6:18 pm on or about April 1, 2015, HASANZADEH forwarded the same email (and attachments) to Coconspirator A (subject line: "Fw: First revision").

31. On or about April 23, 2015, HASANZADEH's wife, an Iranian national living in Michigan who did not work for Company A, sent an email to one of HASANZADEH's personal email accounts with the subject line, "Love U So Much." The email included notes dated April 13, 2015 from an internal Company A meeting, and schematics and technical details regarding one of Company A's confidential and proprietary printed circuit boards. Taken together, the internal meeting notes, schematics, and technical details constituted an "ingredient list" that would allow someone else to replicate and manufacture Company A's proprietary printed circuit board.

32. At approximately 12:32 pm on or about May 4, 2015, HASANZADEH sent an email from his personal email account to Coconspirator A with the subject line, "Sch." A day later, on or about May 5, 2015 at approximately 9:49 am, HASANZADEH sent another email from his personal email account to Coconspirator A with the subject line, "Description." Attached to both the May 4 and 5, 2015 emails were numerous highly sensitive and proprietary technical documents and data belonging to Company A.

33. At approximately 4:03 pm on or about May 17, 2015, HASANZADEH used his personal email account to send an email to Coconspirator A with the subject line, "Re 1st Code." This email contained highly sensitive and proprietary technical documents and data, including schematics, that belonged to Company A.

34. On or about May 20, 2015, HASANZADEH used his personal email account to send an email to Coconspirator A (subject: "5CGXFC387F23C8N") which contained a highly sensitive and proprietary functional specification for an integrated circuit that was designed by and belonged to Company A. Part of the functional specification had been edited, but the bulk of the specification contained highly sensitive and proprietary information related to Company A's integrated circuit design.

35. On or about April 10, 2016, HASANZADEH used his personal email account to send multiple emails to Coconspirator A. One of the emails that HASANZADEH sent to Coconspirator A at approximately 1:10 pm on or about April 10, 2016 lacked a subject line, but contained a highly sensitive and proprietary technical document and data concerning an integrated circuit design that belonged to Company A. The technical information and data contained in the April 10, 2016 email related to Company A's Omega product and the proprietary

document contained the warning, "[Company A] Confidential Document not to be distributed or duplicated without permission."

36. On or about April 11, 2016, HASANZADEH forwarded this email (and attachment) to his wife. The forwarded email contained neither a subject line (other than "Fw:") nor any text in the body of the email.

37. At approximately 2:15 pm on or about May 1, 2016, HASANZADEH used his personal email account to send an email to Coconspirator A with the subject line, "files." Nine highly sensitive and proprietary technical documents were attached to the email.

38. HASANZADEH and his coconspirators failed to apply for, receive, or possess one or more license(s) from OFAC to export any of the technology set forth above from the United States to Iran.

All in violation of 50 U.S.C. § 1705 and 31 C.F.R. Parts 560.203, 560.204, and 560.418.

## COUNTS TWO—EIGHT

**50 U.S.C. § 1705 and 31 C.F.R. Parts 560.203, 560.204, and 560.418 –
Unlawful export of technology to Iran**

39. On or about each of the dates specified below, in the Eastern District of Michigan and elsewhere, HASANZADEH unlawfully, knowingly, and willfully exported and supplied and caused to be exported and supplied from the United States to Iran, technology, including schematics, layouts, designs, projects,

diagrams, performance reports, and other documents and data, without having first obtained the required licenses from the Secretary of the Treasury and/or OFAC, in violation of Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Parts 560.203, 560.204, and 560.418.

| **Count** | **Date** | **From** | **To** | **Time** | **Subject** |
|---|---|---|---|---|---|
| 2 | 3/14/15 | Defendant | Coconspirator B | 3:48 pm | HXXXXXXX |
| 3 | 4/1/15 | Defendant | Coconspirator B | 6:18 pm | First revision |
| 4 | 4/1/15 | Defendant | Coconspirator A | 6:18 pm | Fw: First revision |
| 5 | 5/4/15 | Defendant | Coconspirator A | 12:32 pm | Sch |
| 6 | 5/5/15 | Defendant | Coconspirator A | 9:49 am | Description |
| 7 | 4/10/16 | Defendant | Coconspirator A | 1:10 pm | |
| 8 | 5/1/16 | Defendant | Coconspirator A | 2:15 pm | files |

## FORFEITURE ALLEGATIONS

40. Pursuant to Fed. R. Cr. P. 32.2(a), the government hereby provides notice to HASANZADEH of its intention to seek forfeiture of all proceeds, direct or indirect, or property traceable thereto, all property that facilitated the commission of the violations alleged, or property traceable thereto, and all property

involved in, or property traceable thereto, of the violations set for in this Indictment.

    41.   <u>Substitute Assets</u>: If the property described above as being subject to forfeiture, as a result of any act or omission of HASANZADEH:

    a. Cannot be located upon the exercise of due diligence;

    b. Has been transferred or sold to, or deposited with, a third party;

    c. Has been placed beyond the jurisdiction of the Court;

    d. Has been substantially diminished in value; or

    e. Has been commingled with other property that cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c).

**THIS IS A TRUE BILL.**

s/ *Grand Jury Foreperson*
Grand Jury Foreperson

MATTHEW SCHNEIDER
United States Attorney


MICHAEL C. MARTIN
Chief, National Security Unit
Eastern District of Michigan

*s/Douglas C. Salzenstein*
DOUGLAS C. SALZENSTEIN
Assistant United States Attorney
Eastern District of Michigan


ADAM P. BARRY
Trial Attorney
National Security Division
United States Department of Justice


Dated: December 16, 2020

| United States District Court<br>Eastern District of Michigan | Criminal Case Cove | Case: 2:20-cr-20594<br>Judge: Hood, Denise Page<br>MJ: Patti, Anthony P.<br>Filed: 12-16-2020 At 12:51 PM<br>INDI USA V. HASANZADEH (DA) |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accur

| Companion Case Information | Companion Case Number: |
|---|---|
| This may be a companion case based on **LCrR 57.10(b)(4)**[1]: | |
| ☐Yes ☑No | AUSA's Initials: |

**Case Title:** USA v. Amin Hasanzadeh

**County where offense occurred:** Washtenaw

**Offense Type:** Felony

Indictment -- based upon prior complaint [**Case number:** 19-30572]

### Superseding Case Information

**Superseding to Case No:** _____  **Judge:** _____

**Reason:**

| **Defendant Name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|
| | | |

---

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case**

December 16, 2020
_____
Date

_____
Douglas C. Salzenstein
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
doug.salzenstein@usdoj.gov
(313) 226-9196
Bar #: P59288

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.